1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JEREMY FRIEDLANDER, State Bar No. 125138
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
7    Telephone: (415) 703-5974
     Fax: (415) 703-1234
8    Email: Jeremy.Friedlander@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14  AN DUY NGUYEN,                          C 07-3979 SI (PR)

15                           Petitioner,

16          v.

17  MIKE EVANS, Warden,

18                           Respondent.

19

20  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO
      PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 2

    Introduction ........................................................................................ 2

    The Fatal Altercation As Shown On The Videotape ............................ 2

    The Parties' Theories Of The Case ...................................................... 7

    The Prosecution's Case ....................................................................... 8

    The Defense ........................................................................................ 10

STANDARD OF REVIEW ............................................................................ 12

ARGUMENT ................................................................................................. 12

I.     THE STATE APPELLATE COURT REASONABLY REJECTED THE CLAIM THAT THE TRIAL COURT AND THE PROSECUTOR VOUCHED FOR THE CREDIBILITY OF WITNESS BAO TRAN. ............................................................................. 12

    A.   Factual Background ................................................................... 13

    B.   The State Court's Rejection Of The Claim ................................ 14

    C.   Petitioner's Argument ............................................................... 15

II.    THE STATE APPELLATE COURT REASONABLY REJECTED THE CLAIMS THAT THE PROSECUTOR COMMITTED MISCONDUCT IN CLOSING ARGUMENT. .................................... 18

    A.   The Prosecutor's First Statement ............................................. 18

    B.   The Prosecutor's Second Statement ......................................... 20

    C.   The Prosecutor's Third Statement ............................................ 20

    D.   The Prosecutor's Fourth Statement .......................................... 22

    E.   The Prosecutor's Fifth Statement ............................................. 23

III.   THE STATE APPELLATE COURT REASONABLY REJECTED THE CLAIM THAT DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE ASSERTED INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED PETITIONER OF EFFECTIVE ASSISTANCE OF COUNSEL. ................................... 25

**TABLE OF CONTENTS  (continued)**

|  |  | Page |
|---|---|---|
| IV. | THE STATE APPELLATE COURT DID NOT UNREASONABLY REJECT PETITIONER'S CLAIM THAT SUPPOSEDLY "IMPROPER PINPOINT INSTRUCTIONS" VIOLATED DUE PROCESS. | 25 |
| V. | THE STATE APPELLATE COURT DID NOT UNREASONABLY REJECT PETITIONER'S CLAIM OF CUMULATIVE ERROR. | 27 |
| VI. | THE STATE SUPREME COURT REASONABLY REJECTED PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL. | 27 |
| CONCLUSION | | 28 |

# TABLE OF AUTHORITIES

1

2 **Page**

3 **Cases**

4 *Boyde v. California*
494 U.S. 380 (1990)     19

5

*Brecht v. Abrahamson*
6 507 U.S. 619 (1993)     18, 25

7 *Chambers [v. Mississippi*
410 U.S. 284(1973)     27

8

*Darden v. Wainwright*
9 477 U.S. 168 (1986)     18

10 *Donnelly v. DeChristoforo*
416 U.S. 637 (1974)     18, 20

11

*Early v. Packer*
12 537 U.S. 3 (2002) (per curiam)     12

13 *Estelle v. McGuire*
502 U.S. 62 (1991)     26

14

*Fry v. Pliler*
15 ___ U.S. ___, 127 S. Ct. 2321 (2007)     18

16 *Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002)     12

17

*Mitchell v. Esparza*
18 540 U.S. 12 (2003) (per curiam)     12

19 *Parle v. Runnels*
505 F.3d 922 (9th Cir. 2007)     27

20

*People v. Boyette*
21 29 Cal.4th 381 (2002)     26

22 *People v. Frye*
18 Cal.4th 894 (1998)     16

23

*People v. Jackson*
24 13 Cal.4th 1164 (1996)     26

25 *People v. Medina*
11 Cal.4th 694 (1995)     16

26

*Rich v. Calderon*
27 187 F.3d 1064 (9th Cir. 1999)     15

28

**TABLE OF AUTHORITIES  (continued)**

Page

*Richardson v. Marsh*
481 U.S. 200 (1987)                                                                                         21

*Smith v. Phillips*
455 U.S. 209 (1982)                                                                                         18

*Smith v. Robbins*
528 U.S. 259 (2000)                                                                                         28

*United States v. Creamer*
555 F.2d 612 (7th Cir. 1977)                                                                          16

*United States v. Necoechea*
986 F.2d 1273 (9th Cir. 1992)                                                                    15, 16

*United States v. Townsend*
796 F.2d 158 (6th Cir. 1986)                                                                          16

*United States v. Young*
470 U.S. 1 (1985)                                                                                      15, 16

*Victor v. Nebraska*
511 U.S. 1 (1994)                                                                                          21

*Weeks v. Angelone*
528 U.S. 225 (2000)                                                                                        21

*Williams v. Taylor*
529 U.S. 362 (2000)                                                                                        12

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                                                                     12

*Yarborough v. Gentry*
540 U.S. 1 (2003) (per curiam)                                                                     28

**Statutes**

United States Code
          Title 28 § 2254(d)(1)                                                                          12

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996                                  12

California Jury Instructions, Criminal
          No. 2.03                                                                                           25
          No. 2.06                                                                                           25
          No. 2.52                                                                                           25

1    EDMUND G. BROWN JR.
     Attorney General of the State of California
2    DANE R. GILLETTE
     Chief Assistant Attorney General
3    GERALD A. ENGLER
     Senior Assistant Attorney General
4    PEGGY S. RUFFRA
     Supervising Deputy Attorney General
5    JEREMY FRIEDLANDER, State Bar No. 125138
     Deputy Attorney General
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 703-5974
      Fax:  (415) 703-1234
8     Email:  Jeremy.Friedlander@doj.ca.gov

9    Attorneys for Respondent

10                 IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

| 14 | AN DUY NGUYEN, | C 07-3979 SI (PR) |
| 15 | Petitioner, | **MEMORANDUM OF POINTS** |
| 16 | v. | **AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF** |
| 17 | MIKE EVANS, Warden, | **HABEAS CORPUS** |
| 18 | Respondent. | |

19

20                      **STATEMENT OF THE CASE**

21          On December 1, 2004, a jury convicted petitioner of second degree murder for the killing

22   of Vu Linh Pham on about April 21, 2000.  The jury also found personal knife use and gang

23   allegations true.  CT 1280-81.  On February 25, 2005, petitioner was sentenced to 15 years to life

24   for the murder and an additional consecutive year for the weapon enhancement.  A 10-year sentence

25   for the gang enhancement was stayed.  CT 1330-33.

26          The intermediate state court of appeal affirmed the judgment on May 18, 2006.  The state

27   supreme court denied both review and a state habeas corpus petition on September 13, 2006 (case

28   numbers S144644, S144716).  On August 2, 2007, petitioner filed in this Court for federal habeas

1  relief.  This Court issued a show cause on September 18, 2007.  The show cause order directed

2  respondent to answer all of petitioner's claims except the fifth (a challenge to self-defense

3  instructions), which the Court found did not raise a federal question.

4  <center>**STATEMENT OF FACTS**</center>

5  **Introduction**

6  Petitioner killed Vu Pham (hereafter "Vu"—shown in People's Exh. 1:  RT 779, 858) by

7  stabbing him in the heart with a knife.  RT 1350.  The blade of the knife was four to five inches long

8  RT 1313); the fatal wound was five inches deep.  RT 1350.  In his statement to the police, petitioner

9  continually denied that he committed the killing.  RT 1594.  At trial, he said he killed Vu in self-

10  defense.  A tape of the interview was played after petitioner testified.  RT 1626; People's Exh. 147.

11  Vu was unarmed.  Petitioner was uninjured.  RT 1553, 1560 [petitioner's testimony].

12  The killing followed a brief altercation in the Tinh Café between members of two rival

13  gangs:  Vietnamese Gangsters (petitioner's group, hereafter "VG"—RT 729) and Asian Warriors

14  (Vu's group, also known as "A-Dub"—RT 727).  The café's videotape system captured much of the

15  altercation, though not the killing itself, in a chronological sequence of pictures from different

16  cameras.  The jury was shown various forms of the videotape and excerpts from it.  The main

17  videotape was People's Exhibit 2 (also referred to as "Tape 4"—RT 1257, 1376)—a DVD disc

18  recording that counsel for respondent has carefully reviewed.[1]  The reporter's transcript contains

19  many references to the times on the videotape at which various events occurred.  The subsection

20  below is a summary of the videotape supplemented by undisputed testimony.[2]

21  **The Fatal Altercation As Shown On The Videotape**

22  Petitioner came to the café with three friends:  Bao Tran (hereafter "Bao"—People's Exh.

23

24  1. The Attorney General's Office can make a copy of the DVD and provide it for the Court

25  if the Court so desires.

26  2. Detective Terence Simpson, one of the two primary investigators in the case (RT 1062),
   testified about a series of still photographs taken from the tape. (People's Exhs. 97-121: RT 1246-

27  55, 1264-67.  Testimony about these photos corroborates the summary of the tape.  Respondent
   provided essentially the same summary to the state appellate court in the respondent's brief.  Exh.

28  F at 3-9. Petitioner did not dispute the summary but did add his own "observations." Exh. G at 1-2.

17: RT 1069, 1159), Cuong Tran (hereafter "Cuong"—People's Exh. 4 [RT 803, 809, 861-63, 953, 1069, 1159]), and Trung Nguyen (hereafter "Trung"—People's Exh. 6: RT 1069, 1159])[3/]. RT 1300. The Asian Warriors and some of their girlfriends were already in the café, seated at two long tables parallel to each other and to a partition that separated the seating area from the front door.

The videotape shows Vu sitting with the Asian Warriors at the left end of the second long table from the partition. His jacket is on the back of his chair, and he is facing the table, which leaves his back to a makeshift corridor between the front-door area and the interior of the café. (*See*, *e.g.*, 10:38:37-20[4/], 10:39:13-23; 10:39:58-52; 10:40:17-00; 10:40:30-09; 10:40:41-23.) Cuong and Trung enter the café, walk down the corridor past Vu (10:42:15- 10:42:19; RT 1247—People's Exh. 99), and seat themselves at a table farther inside the café. (10:42:23-30; 10:42:26-21; 10:42:34.) Cuong is wearing a grayish sweatshirt,[5/] Trung a long white jacket. RT 1303. Looking over his left shoulder, Cuong appears to be looking at several of the Asian Warriors seated at the table nearest the partition, and the Asian Warriors are looking directly at him. (10:42:36-20.)[6/] One of the Asian Warriors is Duy Phan (hereafter "Duy"—People's Exh. 19 [RT 1037]), who is wearing a dark jacket. A confrontation between Cuong and Duy a few seconds later precipitated the melee during which petitioner stabbed Vu. Duy and Cuong had fought each other when both were in Juvenile Hall about two years earlier. RT 991, 1055.[7/]

While Cuong and the Asian Warriors including Duy are looking at each other across the

3. All four were originally charged with Vu's murder. Bao pleaded guilty to a charge of being an accessory after the fact and testified for the prosecution. RT 1282, 1329. Petitioner's case was severed from Cuong's and Trung's. CT 1154.

4. The times are taken from the videotape. The first three numbers are hour, minute, and second. It is unclear from the record what the fourth number means. Higher fourth numbers do not necessarily correspond to later times. Thus, 10:42:15-23 may come before 10:42:15-8.

5. The police later collected a gray sweatshirt from Cuong's home. RT 1201-03.

6. The prosecution's gang expert testified that at this point Cuong and the Asian Warriors were "mad-dogging" (RT 1417)—a confrontational way of staring. RT 747.

7. Duy also knew Bao from when they were both incarcerated at a boys' ranch. RT 1006-07, 1332. Duy claimed not to have had any problems with Bao there. RT 1007. Bao said they had not fought. RT 1333.

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

1  room, Vu remains seated at his table, evidently engaged in conversation and unaware of the staring

2  between Cuong and the other Asian Warriors. (10:42:36-20; RT 1452-1453.) Cuong begins to rise

3  from his seat (10:42:39:05), followed by Trung (10:42:42), and the camera loses sight of them.

4       Testimony established without dispute that at this point the following events occurred,

5  though they are not shown on the tape. Petitioner and Bao entered the café and walked down the

6  makeshift corridor past Vu. RT 1302.[8/] As he passed petitioner in the corridor, Cuong told him, "A-

7  Dub is here." RT 789, 1303, 1562. Cuong moved toward the front past Vu, stopped, and exchanged

8  stares and verbal challenges with Duy.  RT 859-60, 898-99, 902, 1004, 1017-20, 1022,1307-09,

9  1334.  This was the confrontation that led to the melee during which petitioner stabbed Vu.

10       At 10:42:45-97, the tape shows part of petitioner in the upper left corner as he is moving

11  toward the table in the interior of the café where Cuong and Trung had been sitting.  Petitioner is

12  wearing a plaid, Pendleton shirt (RT 1303, 1436) and a white baseball cap.  He has passed Vu, who

13  is shown still seated at his table.  This point in the tape is about the time when petitioner passed

14  Cuong and Cuong told him of the presence of the Asian Warriors.

15       At 10:42:54-06, petitioner is shown standing with Bao near the table where Cuong and

16  Trung had been seated.  Bao is wearing a long-sleeved, light-colored jacket.  Petitioner is looking

17  off camera, as are several of the Asian Warriors—evidently, toward Cuong as he is confronting Duy.

18  RT 1248; People's Exh. 102. Vu is looking to his right, toward petitioner and Bao and away from

19  Cuong, who would be behind him to his left.

20       At 10:42:56-01, petitioner has turned away from the confrontation to face a waitress who

21  has tapped him on the shoulder and beckoned him to be seated at the table. RT 1437.  Petitioner has

22  his left hand in his front pants pocket. RT 1437.  Vu is obscured by Bao, who is walking up the

23  makeshift corridor toward him and the front.  *See* RT 1338 [Bao's testimony describing film at

24  10:42:57].

25       At 10:42:56-10, Duy is shown at the top of the screen, still seated.  He is saying something

26  to someone off camera to the left of the frame, evidently Cuong.  At 10:42:57-44, Duy is rising—the

27

28      8. At 10:42:37, petitioner is shown at the very top left corner of the screen, entering the café.

1    first Asian Warrior to do so—and looking beyond the left edge of the frame. *See* RT 1249: People's

2    Exh. 105 [still photo from 10:42:58].

3         At 10:42:57-99, Bao has moved past Vu, into camera range. Vu is still seated at the table

4    with his back to the corridor. His left leg is crossed over his right leg at the knee, and his right hand

5    or wrist is resting on the ankle of his left leg. RT 1438. He has an unlit cigarette in his mouth. He

6    is looking to his right, at petitioner. RT 1438.[9] Petitioner has turned away from the waitress and

7    has begun moving in the direction of Vu and the front. He is looking ahead, toward where Cuong

8    would be, rather than at Vu. Several of the Asian Warriors are shown looking off the screen to the

9    left, evidently at Cuong as he continues to confront Duy. Vu continues to appear to be unaware of

10   the confrontation.

11        At 10:42:59-81, petitioner has walked up the corridor toward Vu but has not quite reached

12   him. Though mostly obscured in the frame by petitioner, Vu is still seated with his left leg crossed

13   over his right knee. RT 1441. This is the last frame showing petitioner before the stabbing. Other

14   Asian Warriors have begun to stand and are looking toward the area off camera where Cuong would

15   be. Duy has retreated and has moved toward the partition and the front door.

16        At 10:43:00 through 10:43:05, the camera focuses on the table where Cuong and Trung

17   had been sitting. The tape therefore largely misses the melee, though it is evident that one is

18   occurring. At the edges of the screen, Asian Warriors are shown standing in guarded postures and

19   looking to the front and the left. By 10:43:06, the camera shows that the two tables where the Asian

20   Warriors had been sitting are vacant.

21        At 10:43:02-82, Vu is partly shown in the upper left corner of the screen. He has begun

22   to rise from his chair, and he appears to be turning to his left, as if facing the area where the

23   confrontation between Cuong and Duy has been happening. At 10:43:02-06 (a frame that comes

24   after 10:43:02-82), Vu is standing. RT 1445. Through 10:43:05-74, he is shown continuing to stand

25

26

27        9. Defense counsel suggested and the prosecution's gang expert agreed that at this point Vu
     appeared to be "mad-dogging" (RT 1438-1439) and thereby challenging petitioner. RT 1449-50.

28   However, it was uncontested that petitioner was not looking at him (RT 1494-1495 [petitioner's
     testimony]), so petitioner did not notice whatever challenge Vu may have been appearing to initiate.

1  and beginning to put on his jacket. RT 1446. At 10:43:06, Vu is no longer in the picture, as the

2  camera angle changes to show the two now-vacated tables where the Asian Warriors had been

3  sitting. Vu was stabbed during the roughly three seconds (10:43:06—10:43:09) during which he is

4  not shown. (See RT 1499, 1568 [petitioner's testimony agreeing that stabbing occurred when Vu

5  is not shown on the videotape]. See below for the parties' theories on exactly what happened in that

6  time frame.)

7          Vu reappears at 10:43:08-56. RT 1447. While other Asian Warriors are moving toward

8  the front door on the right side of the picture, the camera captures the back of Vu's head as Vu

9  moves from left to right—away from the area where he had been standing and where petitioner

10  stabbed him. As the film advances, Vu turns toward his left (the area where petitioner would be) and

11  backs away to the right. The cigarette remains in Vu's mouth. RT 1448; 10:43:09-15. At 10:43:10,

12  Vu leaves the screen to the right. At 10:43:11, other Asian Warriors are scrambling to the front door

13  past the right side of the partition (RT 1448) while an object is thrown at them from across the room

14  to the left. Vu reappears momentarily at 10:43:12, still looking across the room as he edges toward

15  the front and the exit. The cigarette is still in his mouth.

16          By 10:43:12-02, the camera angle has changed to a wider view of the room. Petitioner is

17  shown in the bottom left corner about to throw a glass. Vu is in the right side of the picture, moving

18  toward the partition and the front door and continuing to put on his jacket. (See RT 1250-51;

19  People's Exhs. 108 [still photo from 10:43:13] and 109 [still photo from 10:43:14]; RT 1503

20  [petitioner's testimony].) At 10:43:13-71, petitioner is throwing the glass at Vu, missing him to the

21  right as Vu moves to the left toward the partition. RT 1503 [petitioner's testimony]. At 10:43:15-

22  59, Vu moves behind the partition, still trying to put on his jacket. He is one of the last Asian

23  Warriors to leave the café. At 10:43:15-70, Cuong re-enters the film, moving in from the left and

24  looking toward the right of the partition where Vu has just left. At 10:43:16-39, petitioner is shown

25  clearly holding the knife in his left hand with his arm extended. See RT 1252-53; People's Exh. 112

26  [still photo from 10:43:16]. At 10:43:17-77, Cuong is looking toward the partition and the front

27  door while making a "VG" sign with his hands. See RT 1254; People's Exhs. 115, 116 [still photo

28  from 10:43:17]; RT 1572 [petitioner's testimony]. Petitioner is behind him, looking in the same

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

1    direction and still holding the knife in his left hand.

2    Testimony established that Vu collapsed on the pavement outside the café immediately
3    after he left. RT 794, 877, 1029. Although it took his friends twenty minutes or more to get Vu to
4    the hospital (*see* RT 796-798; 878-879; 961-966), the coroner testified without dispute that it would
5    have been almost impossible to save his life even if he reached the hospital within seconds. RT
6    1352. An unsmoked cigarette and a Bic cigarette lighter were found by the police at the spot where
7    Vu collapsed. RT 1190, 1591; People's Exh. 4 [photo].

8    **The Parties' Theories Of The Case**

9    Petitioner, the only witness to describe the actual stabbing, said he drew his knife when
10   someone threw a chair in his direction, glasses were thrown, and people started running. RT 1499-
11   1500. He first became aware of Vu when Vu suddenly came toward him (RT 1501, 1566, 1569)
12   from a little behind him and to the right. RT 1501, 1555, 1556. (Petitioner thereby implied that he
13   had moved slightly past Vu at the time of the stabbing.) Vu had his hand raised (RT 1501-1502,
14   1569), and petitioner thought he saw something in it. RT 1502, 1555, 1567. Reacting in fear,
15   petitioner stabbed Vu in the chest. RT 1502, 1557. Petitioner swung the knife with his left hand
16   from his waist into the middle of Vu's body. RT 1556, 1558. He stabbed Vu in the heart only
17   accidentally. RT 1557. The other Asian Warriors were still in the café at the time of the stabbing
18   (RT 1569), and petitioner claimed to have been scared of them. RT 1570. However, he admitted
19   that they were leaving the café (RT 1570) and that Vu was the last to leave. RT 1566. There was
20   no evidence (from the film, petitioner, or anyone else) that any of the other Asian Warriors were or
21   appeared to be endangering petitioner at the time he stabbed Vu. Petitioner didn't remember Vu
22   putting his coat on. RT 1568. Petitioner said he threw the glass at Vu after stabbing him because
23   petitioner "just want[ed] to get him as far away from me as possible." RT 1504.

24   Defense counsel implied that Vu attacked or appeared to attack petitioner as soon as
25   petitioner moved past Vu toward the front of the café. Defense counsel argued that Vu (1) knew
26   what was going on between Cuong and Duy (RT 1754) while he was looking (in the opposite
27   direction) at petitioner; (2) could reasonably have appeared to be reaching for a weapon (possibly
28   the cigarette lighter) in the shoe of his crossed leg (RT 1756-1757), and (3) may have been waiting

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

7

1   for petitioner to walk past him so that Vu could attack petitioner.  RT 1755.

2        The prosecutor argued that petitioner stabbed Vu in a sneak attack.  The prosecutor noted

3   that the videotape showed Vu making no aggressive movement or, indeed, any movement at all

4   toward petitioner, and that no one other than petitioner said that Vu did so.[10/]  The prosecutor also

5   argued that, by his own admission, petitioner held the knife next to his leg, keeping the weapon all

6   but hidden before the stabbing.  (The videotape does not show the knife until after the stabbing.)

7   The prosecutor said petitioner would have displayed the knife if he had been attempting to use it to

8   defend himself.  The prosecutor said Vu never realized petitioner was about to stab him.  (*See* RT

9   1729 [prosecutor's closing argument: Vu completely unaware what is about to happen; he didn't get

10  out of that coffee shop fast enough]; RT 1730 [Vu didn't realize what was about to happen; didn't

11  realize the danger].)  The prosecutor said petitioner was fifteen to twenty feet away from Vu when

12  he threw the glass at him.  RT 1783.

13  **The Prosecution's Case**

14       The prosecution called seven witnesses who were in the café at the time of the altercation.

15  Three were Asian Warriors: Duy Phan ("Duy"), Sy Tran (hereafter, "Sy" [People's Exh. 15: RT

16  973]), and Anh Nguyen (hereafter "Anh" [People's Exh. 3: RT 799]—no relation to petitioner

17  despite the similarity in names).  Two witnesses were girlfriends of Asian Warriors in the café.  One

18  was Kimhoung Nguyen, who was Anh's sister RT 790, 815) and Duy's girlfriend.  RT 815, 988.

19  She was referred to at trial (and is referred to hereafter) as "Stephanie."  RT 814; People's Exh. 7:

20  RT 885.  The other girlfriend witness was Trang Nguyen (hereafter, "Trang"—People's Exh. 10: RT

21  926-927), who was the girlfriend of Viet Mai (RT 906), an Asian Warrior who was present in the

22  café but was not called as a witness.[11/]  The other three prosecution witnesses from the café were the

---

24  10.  Bao, who said that Vu was close to him at the time the fight broke out (RT 1341), did

25  not see Vu move toward petitioner, saw nothing in his hands, and did not see him swing his fists or
    throw anything.  RT 1341-42.  The record does not make clear to what extent Bao was looking at

26  Vu.

27  11.  Viet Mai and his brother, John Mai, who was also in the café (RT 1167), were found to

28  have gunshot residue on their hands that night.  RT 1168-69, 1374.  This fact tended to show that
    the Mai brothers fired guns after leaving the café.  However, that fact—if it was a fact—had little

1  waitress, Thia Le (hereafter "Thia"); a patron who was unaffiliated with either group, Tam Le

2  (hereafter "Tam"—People's Exh. 23);[12] and finally, Bao Tran, one of petitioner's friends.

3        The videotape at 10:42:15-59 (just before Bao and Trung enter the café) shows the Asian

4  Warriors and their girlfriends.  Stephanie is in the upper left, seated at the end of the long table

5  nearest the partition.  RT 852.  Anh is the first male to the left of Stephanie and the second male to

6  the right of Duy (who is wearing a dark jacket).  *See* RT 785, 848.  Sy is seated to Duy's left, on the

7  right side of the frame.  *See* RT 850.  Viet Mai and Trang are seated next to each other with their

8  backs to the camera at the second table from the partition—the same table as Vu.  RT 915.  Viet Mai

9  is wearing a white stocking cap.

10       A rivalry existed between VG and the Asian Warriors and also between various off-shoots

11 of the two groups.  RT 822-25, 907-09, 931-34, 987, 989, 1290, 1312, 1331.  VG considered the

12 Trinh Café its turf.  RT 827, 855, 1297.

13       The prosecution's witnesses who were in the café described the altercation consistently

14 with the videotape summary in section A1 above.  RT 828-31, 859-76, 896-900 [Stephanie]; RT

15 999-1020 [Duy]; RT 946-58 [Sy]; RT 783-93, 811-13 [Anh]; RT 1087-90 [Thia]; RT 1301-1313,

16 1334-36, 1338 [Bao].

17       In a statement to the police two days after the killing (RT 1142), Thia (the waitress) said

18 that she ran into the kitchen of the café when the fight broke out.  RT 1146-47.  The shorter of two

19 Asian Warriors there said, "Who's A-Dub, fuck A-Dub, I'm going to kill them."  RT 1148.[13]  Then

20 he ran out of the kitchen through the back door of the café and looked around as if trying to find

21 _____

22 bearing on the defense, since there was no evidence that any of the Asian Warriors besides Vu were
   or appeared to be armed while they were in the café.

23

24 12.  Tam Le told the police that he saw petitioner with a gun.  RT 1112.  At trial, he said he
   had lied to the police about everything.  RT 1111.  Duy evidently also told the police that petitioner

25 had a gun (*see* RT 1044-45 [tape of interview]), though at trial he said he did not remember seeing
   the gun and guessed that he told the police he didn't know if petitioner had a gun.  RT 1024.  The

26 prosecutor argued that Duy's testimony on this point was a lie.  RT 1717.

27 13.  The prosecutor argued that it was Cuong who made this statement.  RT 1708-09.  Cuong
   was five feet, five inches and weighed 130 pounds.  RT 1159.  Petitioner was the same height and

28 weighed 110 pounds.  RT 1160.  Bao was five-six and weighed 130.  RT 1159.

1   someone. RT 1149.  In her testimony at trial, she said she did not think that the person who made

2   the statement was shown on the videotape. RT 1089-90.  Bao testified that he ran to the kitchen

3   when the fight broke out. RT 1342.  He did not recall if anyone there yelled, "Who's A-Dub, fuck

4   A-Dub, I'm going to kill them." RT 1322.

5        Bao testified that he left the café with petitioner, Cuong, and Trung (RT 1321) and that

6   gunshots were fired at them from a passing car. RT 1324-25.

7   **The Defense**

8        Petitioner was the only witness for the defense.  He was born on March 8, 1982 (RT 1462,

9   1532), and came to America from Vietnam in 1990. RT 1462.  He joined VG in 1997 (RT 1469)

10  and was tattooed. RT 1468.  Three months after joining VG, he was arrested for burglary (RT 1470,

11  1534-37), pleaded guilty, and was sent to a boys' ranch. RT 1474, 1538.  He ran away, was caught,

12  and was sent back. RT 1476.  In 1998, he moved with his family to Florida (RT 1477, 1540) and

13  joined the National Guard. RT 1477-78, 1540.  In the National Guard, he went through basic

14  training and was taught how to use a bayonet. RT 1541.  He remained friends with Trung and would

15  talk to him on the phone. RT 1478.

16       Petitioner returned to California in March 2000. RT 1481, 1544.  He considered himself

17  to be no longer a gang member, having given up membership when he moved to Florida. RT 1482-

18  83, 1543.

19       On April 21, 2000, he went to the café with Bao, Trung, and Cuong. RT 1486-89.  As he

20  customarily did, petitioner was carrying a knife in a sheath attached to his belt at the back of his

21  pants. RT 1488.  He was carrying the knife for protection because "there's just some people that just

22  don't like Vietnamese people, and I'm small, I'm like five feet five, sometimes people just tend to

23  pick on smaller people. . . ." RT 1573.  When petitioner walked into the café, Cuong walked past

24  him and said not only that A-Dub was there but that they should leave. RT 1491, 1563.  Petitioner

25  wanted to leave because he knew of the animosity between VG and A-Dub, and he knew A-Dub had

26  a reputation for carrying guns and knives. RT 1491, 1574.  When the waitress tapped him on the

27  shoulder and suggested that he sit down, he declined. RT 1492, 1562.  He was not afraid, but he was

28  nervous. RT 1492.

1    When Vu was looking at petitioner, as shown in the videotape, petitioner did not notice

2  him (RT 1494-95) because petitioner was not looking at him. Rather, petitioner was focused on the

3  front door, intending to leave. RT 1494. Duy was "calling Cuong out" while Cuong was trying to

4  leave. RT 1495, 1565. Cuong stopped, turned to Duy, and said, "What's up." RT 1495. Petitioner

5  was walking toward the front at the time. He thought there might be a fight. RT 1496, 1498.

6    Petitioner described the ensuing melee and the stabbing as stated in the section

7  summarizing the parties' theories of the case, above. Petitioner claimed he never intended to kill Vu;

8  he thought he was being attacked and that his life was in jeopardy. RT 1523. He did what he had

9  to do to save himself. RT 1580.

10    After the Asian Warriors fled, petitioner heard a loud gunshot from the front door. He ran

11  to the kitchen with Cuong and Bao. RT 1507, 1572, 1575, 1577. He heard no one say, "Fuck A-

12  Dub, I'll kill them all." RT 1507, 1577. Leaving the café by the side door, he heard a gunshot and

13  ran back inside. RT 1507, 1573, 1574. When he left a second time, through the front door, gunshots

14  were fired at his group from a passing car. RT 1508.

15    He fled with his three companions in Bao's car. RT 1508-09. They went to a parking lot,

16  where petitioner remained until the next morning. RT 1510. Two friends came there and told him

17  that Vu had died; they were so sure that petitioner believed them. RT 1511, 1545, 1580. He

18  panicked and fled (RT 1511-12), taking a bus to Chicago (RT 1513, 1546, 1583) and eventually

19  going to his mother's home in Florida. RT 1514, 1583. He stayed with his mother for a year, lived

20  in North Carolina for three or four months with his girlfriend, returned to his mother's place for four

21  or five months, then went back to North Carolina, where he was arrested. RT 1516, 1546.

22    When shown the videotape of the altercation by the police, he denied that he was

23  himself—the person shown on the video in the plaid shirt and white hat, holding a knife. RT 1521.

24  He lied when he said that he and his friends were leaving the restaurant because there was no place

25  to sit; the real reason was that A-Dub was there. RT 1548. He lied when he said that he had no

26  weapon; in fact he had a knife. RT 1548. He lied when he said that he didn't throw a glass, that he

27  ran away as soon as the fight started, and that he wasn't wearing a hat. RT 1550. He lied when he

28  said he never stabbed anyone. RT 1551. He lied because he didn't know much about the law, didn't

1 | trust the police officer, and didn't know what he would be admitting to. RT 1522, 1560, 1588.

2 | **STANDARD OF REVIEW**

3 |     A federal habeas court reviews the state court's ruling under a highly deferential standard

4 | imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Woodford v.*

5 | *Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). The federal court has no authority to grant habeas

6 | relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

7 | clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A "contrary" decision is one

8 | that arrives at a conclusion opposite one reached by the Supreme Court on a question of law.

9 | *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable" decision applies the law to the

10 | facts in a manner that is not merely erroneous but objectively unreasonable. *Id.* at 411-13. The

11 | petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*,

12 | 537 U.S. at 25.

13 |     A state court does not act contrary to the applicable law "so long as neither the reasoning

14 | nor the result of the state-court decision contradicts" it. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per

15 | curiam). By the same token, a state court may use imprecise or shorthand language to describe the

16 | applicable rule. *See Woodford v. Visciotti*, 537 U.S. at 23-24. A federal court in an AEDPA habeas

17 | case reviews the reasonableness of the state court's ultimate decision, not the reasoning process by

18 | which the court reached that decision. *See Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002)

19 | (intricacies of state court's analysis unimportant; what matters was whether the state court's decision

20 | was contrary to controlling federal law). A state court need not cite or demonstrate an awareness of

21 | Supreme Court cases as long as its reasoning and result do not contradict them. *Mitchell v. Esparza*,

22 | 540 U.S. 12, 16 (2003) (per curiam).

23 | **ARGUMENT**

24 | **I.**

25 | **THE STATE APPELLATE COURT REASONABLY REJECTED THE**
26 | **CLAIM THAT THE TRIAL COURT AND THE PROSECUTOR VOUCHED FOR THE CREDIBILITY OF WITNESS BAO TRAN.**

27 |     Petitioner claims that the prosecutor and the trial court "vouched" for the credibility of Bao

28 | Tran: "By representing to the jury that the prosecution had only asked Bao Tran to tell the 'truth,'

1  the prosecution—and indeed, the court—improperly suggested to the jury that the prosecution and

2  the court had some unexplained method or insight which allowed them to determine whether the

3  witness' testimony was truthful." Pet. Rev.[14/] at 5.

4  **A.  Factual Background**

5      The state appellate court's rejection of the claim supplies the factual background to it:

6      Bao negotiated a guilty plea to being an accessory after the fact. [Footnote omitted.]
   As part of the plea bargain, he agreed to testify honestly and truthfully for the People and

7  accept a reinstatement of the murder charge if the trial court found that he did not fulfill
   the plea-bargain obligations. The trial court admitted a copy of the written plea bargain

8  in evidence.

9      Bao initially testified that, when he and defendant met up with Cuong in the café,
   Cuong advised them to leave because Asian Warriors were present. But, when confronted

10  by his inconsistent statement to the police, Bao admitted that Cuong had instead expressed
    his intent to start a fight. Bao later answered a series of questions by denying recollection.

11  When he did so to a question inquiring whether Vu had a weapon or threatened anyone,
    the trial court addressed Bao as follows:

12

13      "THE COURT: [Bao], your answers since you've been on the witness stand here is
    I don't recall, I don't remember. I want to remind you of the agreement you made with

14  the Court to tell the truth, the whole truth, and nothing but the truth. . . . [¶] . . . When
    someone sees someone with a weapon inside of a small restaurant and is asked if they saw

15  that person in the future with a weapon, the answer normally wouldn't be I don't recall.
    Either you did or you didn't. And several times you've been asked questions of a situation

16  which would be considered a serious magnitude in anyone's life, and every time you
    answer you don't remember. [¶] I do want to remind you that I am the one that will be

17  deciding what your sentence is to be based on the good faith of your keeping the bargain
    that we have. Now, so far you saying you don't recall to very serious items or

18  conversations under extreme circumstances is not in your favor. [¶] . . . [¶] . . . Now, I'm
    not trying to intimidate you into saying something that's not true. What I am trying to do

19  is bring to your attention the importance that you must tell the truth [¶] . . . [¶] . . . But
    both attorneys are asking you very serious questions. It's important that we know as close

20  as possible the truth. So when the attorneys ask you questions do your best to tell the
    truth."

21      Bao then testified that he did not see any weapons or threatening behavior.

22      The prosecutor later argued to the jury that defendant and the other Vietnamese
    Gangsters understood that they were going to attack the Asian Warriors: "Bao told you,

23  didn't want to tell you, but because he's here on a plea agreement that he's got to tell the
    truth or he could be facing murder charges again, said, yeah, I knew when Cuong walked

24  back that we weren't leaving, that he was going to challenge the Asian Warriors." He also
    discounted that Cuong urged his companions to leave: "Well, first off, Bao Tran initially

25  said that's what happened. When he was challenged and questioned and pointed out that

26

27      14. Petitioner has provided the arguments in support of his claims in two documents attached
    to his petition: his petition for review to the state supreme court ("Pet. Rev.") and his state habeas

28  corpus petition to that court ("State Hab. Pet.").

1   he had a plea agreement to testify truthfully he said, no, I know Cuong was going over to
    challenge the Asian Warriors. I knew that. I knew that we weren't walking out of the
2   coffee shop. So this assumption that the [Asian Warriors] are here, let's go, you're really
    relying upon the defendant in forming that opinion because that didn't happen."

4   Opn. at 3-4.

5   **B.   The State Court's Rejection Of The Claim**

6       The state court rejected petitioner's claim with the following explanation:

7       Defendant argues: "By representing to the jury that the prosecution had only asked
        Bao Tran to tell the 'truth,' the prosecution—and, indeed, the court—improperly
8       suggested to the jury that the prosecution and the court had some unexplained method or
        insight which allowed them to determine whether the witness's testimony was truthful.
9       Making such a suggestion to the jury directly involves the prosecution in the improper and
        unethical practice of vouching for its own witnesses." There is no merit to this claim.

11      "'Impermissible "vouching" may occur where the prosecutor places the prestige of
        the government behind a witness . . . or suggests that information not presented to the jury
12      supports the witness's testimony.'" (*People v. Williams* (1997) 16 Cal.4th 153, 257.)
        However, "'[p]rosecutorial assurances, *based on the record*, regarding the apparent
13      honesty or reliability of prosecution witnesses, cannot be characterized as improper
        "vouching," which usually involves an attempt to bolster a witness by reference to facts
        *outside* the record.' [Citation.]" (*Ibid.*) [Italics in case cited by *Williams*.]

15      Here, the prosecutor's remarks about Bao's honesty were based on the plea bargain
        agreement that was in the record, and so did not constitute vouching. As was the case in
16      *People v. Frye* (1998) 18 Cal.4th 894, there was no error in the prosecutor's recounting
        the nature of the prosecution's agreement with a witness as an aid to the jury's evaluation
17      of his credibility. (*Id.* at p. 971 [immunity agreement].) Neither the phrasing nor the
        content of Bao's plea bargain agreement suggested a pretrial determination by the
18      prosecutor that Bao would be telling the truth, or otherwise portrayed the prosecutor's
        office as privy to information bearing on Bao's veracity that was not admitted at trial.
        (*Ibid.*)

20      Defendant's underlying point seems to be that the prosecution "manufactured" Bao's
        evidence by virtue of the plea bargain because "the final arbiter of whether [Bao] had
21      testified 'truthfully' was the prosecution, and, ultimately, the court." But this point
        illustrates an interpretation of the evidence rather than vouching. A plea bargain
22      agreement not only supports a witness' credibility by showing an interest to testify
        truthfully, but also impeaches a witness' credibility by showing an interest in testifying
23      favorably for the government, regardless of the truth. (*United States v. Drews* (8th Cir.
        1989) 877 F.2d 10, 12.) Defendant was free to argue that the prosecution manufactured
24      Bao's testimony.

25  Opn. at 4-5.

26      The state appellate court rejected the vouching claim also by finding that petitioner had

27  waived it by failing to object at trial. Opn. at 5-6. In his state habeas petition, petitioner claimed that

28  trial counsel deprived him of effective assistance of counsel by failing to object. State Hab. Pet. at

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

14

1  19.

2  **C.  Petitioner's Argument**

3  Petitioner procedurally defaulted his claim of prosecutorial misconduct because he failed

4  to object at trial and the state appellate court found that he thereby forfeited his claim.  *Rich v.*

5  *Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999).  Petitioner's ineffective assistance claim fails

6  because the state court reasonably rejected the prosecutorial misconduct claim on the merits.

7  Petitioner does not address the state appellate court's discussion of his claim on the merits.

8  He does note cite any High Court authority.  The cases he does cite support only general principles

9  or apply to factual situations plainly different from this one.  For these reasons alone, petitioner has

10  failed to show (or even allege) that the state court's rejection of the claim was an unreasonable

11  application of High Court precedent.

12  Prosecutorial comments may violate Due Process if they convey to the jury that it is

13  permitted (a) to avoid independently assessing witness credibility and (b) to rely on the government's

14  view of the evidence.  *United States v. Young* 470 U.S. 1, 18-19 (1985).  The question for this Court,

15  then, is whether the state appellate court reasonably found that the jury would not have given the

16  prosecutor's comments either of the objectionable interpretations.  The issue is not close.

17  Far from claiming to have private knowledge of the witness's credibility, the prosecutor

18  focused only on the evidence: the plea agreement itself and its requirement that Bao tell the truth or

19  face re-prosecution for murder.  That another aspect of the plea bargain may have supported a

20  different inference hardly means that the prosecutor was somehow implicitly referring to "some

21  unexplained method or insight" (Pet. Rev. at 5) for gauging the witness's credibility.  In the last

22  analysis, petitioner is arguing simply that the prosecutor's argument was improper because petitioner

23  believes that inference was incorrect.

24  Petitioner cites *United States v. Necoechea*, 986 F.2d 1273 (9th Cir. 1992) (Pet. Rev. at

25  5) but neglects to mention its holding:  that impermissible vouching occurs when the prosecutor

26  refers *in his opening statement* to a truthfulness provision in a plea bargain.  *Id.* at 1278.  By telling

27  the jury before the witness testifies that he has agreed to testify truthfully, the prosecutor implies that

28  the prosecutor has vetted the witness's credibility.  When, as here, the prosecutor tells the jury that

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

1    the witness has testified in a certain way because of his obligation under a plea bargain to tell the

2    truth, the prosecutor is simply drawing an inference from the evidence—an inference that the defense

3    is free to contest and that the jury is competent to evaluate because the inference is based on the

4    evidence.

5        Petitioner also neglects to mention the other relevant holding of *Necoechea*: when a

6    prosecutor asks a witness if his plea agreement requires him to testify truthfully and to cooperate,

7    that question is permissible because it "does not imply a guaranty of [the witness's] truthfulness."

8    *Id. See United States v. Townsend*, 796 F.2d 158, 163 (6th Cir. 1986) and cases there cited (a

9    majority of courts that have considered the matter have held that elicitation during direct examination

10   of a plea agreement containing a promise to testify truthfully does not constitute impermissible

11   bolstering of the witnesses' credibility); *United States v. Creamer*, 555 F.2d 612, 617-18 (7th Cir.

12   1977) (permissible to put before the jury both the witness's understanding of his plea agreement and

13   what would happen if witness violated it; no overt statement of personal belief or insinuation the

14   prosecutor knew better than the jury what the truth was); *People v. Frye*, 18 Cal.4th 894, 971 (1998)

15   (no improper vouching to read the immunity agreement between the prosecution and the witness).

16   If, as the case law establishes, a prosecutor may elicit the evidence that the witness is obliged by a

17   plea bargain to testify truthfully, then it cannot be improper for a prosecutor to cite that evidence in

18   support of his argument that the witness did testify truthfully. *See People v. Medina*, 11 Cal.4th 694,

19   757 (1995) (no improper vouching to argue a witness's credibility based on facts in the trial record).

20       If any error occurred it was harmless. *See United States v. Young*, 470 U.S. at 13, fn.10

21   (improper vouching subject to harmless error analysis). Bao's testimony was relatively unimportant

22   in this case. In closing argument, defense counsel mentioned Bao only once, on the collateral

23   question of whether petitioner got along with rival gang members when he was at the boys' ranch.

24   RT 1747. Bao did very little to harm the defense case, given the undisputed fact that he witnessed

25   neither the stabbing nor what Vu did immediately beforehand. The videotape shows that before the

26   melee began Bao was walking toward the front of the café, past Vu, and away from petitioner, and

27   there is no reason to suppose that he would have looked back toward petitioner and Vu, given that

28   the confrontation between Cuong and Duy—the focal point of the melee—occurred in front of

1   Bao.[15/]

2          Far more important than any witness in this case was the videotape itself—as evidenced

3   by the fact that both counsel stressed it in their closing arguments. The film showed no trace of

4   aggressive movement by Vu and all but ruled out that possibility. As the prosecutor pointed out in

5   closing argument, Vu was last shown before the stabbing reaching behind him to put on his jacket

6   as he stood up. He was shown immediately after the stabbing backing away from petitioner and still

7   trying to put on his jacket. It was at best far-fetched to believe (as the defense required the jury to

8   do) that in the three seconds between those two utterly benign activities Vu somehow became not

9   only an aggressor but an apparent killer. Vu had little or no reason to attack petitioner, given that

10  (1) none of the Asian Warriors had been injured, (2) all of them were fleeing or had fled (and so were

11  unavailable to support Vu), (3) petitioner was not threatening anyone, and (4) there was no history

12  of animosity between Vu and petitioner. Indeed, according to petitioner himself, he did not even

13  know Vu. RT 1493. It was particularly absurd to believe that Vu attacked petitioner in the manner

14  petitioner described—by holding what could only have been Vu's tiny cigarette lighter in a way that

15  made petitioner think it was a weapon. If Vu had intended to attack petitioner, he would not have

16  pretended to use an utterly ineffectual object as a weapon. Finally, by hurling the glass at Vu while

17  Vu was retreating and was far away from him, petitioner made unmistakably clear that petitioner had

18  been the aggressor from the beginning.

19         Because the tape did not show the stabbing, it gave the defense a three-second window in

20  which to inject a self-defense scenario. But given no indication that Vu acted or appeared to act

21  aggressively before or after the three-second period, the self-defense theory was tantamount to a

22  claim that daytime inexplicably became night time for three seconds in the middle of the day.

---

24  15. Arguably, Bao helped the prosecution in that he was the only witness to describe the
    length of the blade of petitioner's knife. He said the blade was four or five inches long. In
25  combination with the depth of the wound to Vu (about the same length), Bao's testimony tended to
    show that petitioner plunged the knife in up to the hilt, which in turn tended to show that the single
26  stab wound was not inflicted in self-defense. However, Bao's testimony about the length of the knife
27  was unnecessary because the jury would have been better able to gauge the length of the blade from
    the videotape, in which petitioner was shown clearly holding out the knife in a ready position after
28  the altercation. *See* 10:43:16-10:43:17.

1    Although the evidentiary portion of the trial took eight days over a two-week period, the jury asked

2    no questions during deliberations and returned its verdicts in less than three hours.  CT 1272, 1280.

3    The videotape establishes that this was not a close case.

4           Accordingly, any impermissible vouching did not have a substantial and injurious effect

5    on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993), *see Fry v. Pliler*, ___ U.S. ___,

6    127 S. Ct. 2321, 2328 (2007) (*Brecht* test applies to habeas corpus cases regardless of whether state

7    court applied federal harmless error test on direct appeal).

8                                            **II.**

9        **THE STATE APPELLATE COURT REASONABLY REJECTED THE**
         **CLAIMS THAT THE PROSECUTOR COMMITTED MISCONDUCT IN**
10       **CLOSING ARGUMENT.**

11          Petitioner contends that he was denied a fair trial by the prosecutor's "many misstatements

12    of the law and other acts of misconduct in his arguments to the jury."  (Pet. Rev. at 9 [argument

13    title].)  Petitioner acknowledges that the state appellate court correctly summarized the statements

14    in question.  *Id.*  After citing general legal principles applicable to the claims (Opn. at 6-7), the state

15    court addressed each statement separately.  Respondent does, too, quoting the state court's decision

16    and then defending it.  First, though, it is necessary to set forth the general legal principles applicable

17    to all the claims.  A federal habeas court must distinguish ordinary trial error of a prosecutor from

18    egregious misconduct that amounts to a denial of due process.  *Darden v. Wainwright*, 477 U.S. 168,

19    181 (1986); *Smith v. Phillips*, 455 U.S. 209, 221 (1982).  The latter occurs when the prosecutor's

20    remarks so infected the trial with unfairness as to make the resulting conviction a denial of due

21    process.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

22       **A.    The Prosecutor's First Statement**

23          Remark No. 1:  defendant claims that the prosecutor misstated the law when he said
         that "the law is clear.  The defendant starts, he's guilty of murder, unless there's evidence
24       to prove that something mitigates it down to a voluntary manslaughter."  Defendant urges
         that the remark served to shift the burden of proof by telling the jury that he had the
25       burden to prove that the offense was less than murder.  We disagree because defendant
         focuses on isolated remarks taken out of context and overlooks the trial court's
26       instructions.

27          The prosecutor introduced the above part of his argument as follows:  "Now, before
         we go into the facts and show you why there's no question as to the crime that the
28       defendant committed, I want to take you through the legal instructions that the Judge just

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

1  told you about and explain to you what's first degree murder, second degree murder,
   voluntary manslaughter, and the law of self-defense. I'm going to take you to why the
2  issue of self-defense is not even something that is supported by the evidence. It's not even
   supported by the defendant. And I'm going to explain to you why all of the charges have
3  been proven against the defendant." He then related that the elements of murder included
   a killing with malice absent self-defense. He continued that malice was express or
4  implied. As to implied malice, the prosecutor argued that the concept's three elements
   were satisfied in the case because defendant admitted that he stabbed Vu, stabbing is
5  inherently dangerous to human life, and Vu knew that stabbing was danger to Vu's life.
   After this, the prosecutor concluded: "So there's no issue about malice aforethought really.
6  [¶] And I will get to the issues of self-defense and heat of passion and sudden quarrel, but
   the law is clear. The defendant starts, he's guilty of murder, unless there's evidence to
7  prove that something mitigates it down to a voluntary manslaughter. However to get to
   a first degree murder, you have to find that the defendant deliberately, willfully, and
8  premeditated the murder of Vu Pham." The prosecutor then went on to argue that the
   murder was of the first degree, self-defense did not apply, and voluntary manslaughter did
9  not apply.

10      In short, the prosecutor made an argument urging that the facts demonstrated a first
    degree murder absent self-defense or mitigation. There is nothing deceptive or
11  reprehensible about such an argument. The prosecutor is given wide latitude to argue
    broadly the law and facts of a case. [Citation.] The prosecutor may comment on the
12  actual state of the evidence [citation] and may "urge whatever conclusions he deems
    proper." [Citation.] Moreover, defendant does not dispute that the trial court properly
13  instructed the jury on the elements of the offenses and burden of proof.

14      There is no reasonable likelihood that the jury took the assailed remarks out of
    context so as to construe or apply them contrary to the trial court's instructions.
15

16  Opn. at 7-8.

17      Petitioner again cites no High Court authority in criticizing the state court's opinion. He

18  argues only that the prosecutor's assertedly incorrect statement "recalls the incorrect instructions

19  given to the jury by the trial court in *People v. Kelley* (1980) 113 Cal.App.3d 1005, where the court

20  told the jury, 'A kills B. If that is all you know—second degree murder.' (*Id.* at 1009.)" Pet. Rev.

21  at 9. Petitioner notes that "*Kelley* reversed the defendants murder conviction based on these

22  instructions. . . ." Pet. Rev. at 9.

23      Petitioner makes no attempt to explain why one should equate statements made by the

24  prosecutor with instructions given by a judge. The United States Supreme Court has stated:

25      . . . arguments of counsel generally carry less weight with a jury than do instructions from
        the court. The former are usually billed in advance to the jury as matters of argument, not
26      evidence . . . and are likely viewed as the statements of advocates: the latter . . . are viewed
        as definitive and binding statements of the law.
27

28  *Boyde v. California*, 494 U.S. 380, 384 (1990). Petitioner's argument fails also because (as the state

1    court noted) it takes the words at issue out of context. *See id.* at 385 (". . . the arguments of counsel,

2    like the instructions of the court, must be judged in the context in which they are made."). 

3    Considered in light of his discussion of malice in the immediately preceding paragraph, the

4    prosecutor was saying only that a defendant is guilty of murder once malice is proved unless there

5    is evidence of malice-negating mitigation. *See Donnelly v. DeChristoforo*, 416 U.S. at 647 ("a court

6    should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging

7    meaning or that a jury . . . . will draw that meaning from the plethora of less damaging

8    interpretations"). These principles are enough to show that the state court did not unreasonably

9    reject petitioner's claim.

10    **B.    The Prosecutor's Second Statement**

11        Remark No. 2: Defendant claims that the prosecutor misstated the law when he said,
     "Now, a voluntary manslaughter is basically the murder of a human being with the intent
12    to kill, but under the law there's ways to mitigate the malice." Defendant asserts that
     voluntary manslaughter is not murder. Again, however, defendant takes the remark out
13    of context.

14        Remark No. 2 was part of the argument that included remark No. 1, which urged that
     the killing was murder. The prosecutor ended this segment of his argument as follows:
15    "So basically if heat of passion, provocation by the victim, or imperfect self-defense don't
     apply, we're talking about a murder. Okay. And then dealing with whether or not it's a
16    premeditated murder or second degree."

17        There is no reasonable likelihood that the jury took remark No. 2 out of context so
     as to ignore the trial court's instructions and convict defendant of murder while intending
18    to convict him of manslaughter.

19    Opn. at 8-9.

20        Petitioner criticizes the prosecutor's remark simply by saying that it was incorrect because

21    "voluntary manslaughter is not a murder." Pet. Rev. at 10. Petitioner has not begun to show a due

22    process violation. Given the rest of the prosecutor's statement (which petitioner ignores), and in

23    light of the correct instructions defining murder and manslaughter, the state court reasonably

24    concluded that the jury understood the law: an unjustified intentional killing is murder unless

25    mitigated by malice-negating heat of passion or unreasonable self-defense.

26    **C.    The Prosecutor's Third Statement**

27        Remark No. 3: Defendant claims that the prosecutor misstated the law on reasonable
     doubt by stating the following: "What does that mean? That means you have to have a
28    doubt as to the defendant's guilt that has to be based upon the evidence. You're not here

to speculate or guess. You've heard a lot of evidence in this case. You've seen a lot of videos, you've heard from people, you've seen diagrams, you have the evidence. This is what you're to derive your verdict from, not to guess. And your decision can't be just based on a mere conflict in the testimony. It's got to be based on the evidence in this case and it has to be reasonable." According to defendant, the remarks "created the danger that [he] might be convicted by the jury based on less than proof beyond a reasonable doubt" because reasonable doubt may well grow out of the lack of evidence as well the evidence adduced.

Once again, defendant overlooks the instructions given in the case, including those on reasonable doubt and the distinction between argument and instructions. And he also again attributes a damaging meaning to a remark taken out of context.

The prosecutor continued the argument containing remark No. 3 as follows: "Okay. Now, if after consideration of this case if there are two reasonable explanations, one that he's not guilty and the other that he is, then you have to find him not guilty. But if there's only one reasonable interpretation and that is that the defendant committed this crime, you must find him guilty."

In other words, the prosecutor's remarks as a whole can be interpreted as urging the jury to consider the explanations of the evidence, which parallels the instruction on reasonable doubt. [Footnote reciting reasonable doubt instruction omitted.]

There is no reasonable likelihood that the jury took the assailed remarks out of context so as to ignore the trial court's instructions and convict defendant on the evidence while harboring a doubt of his guilt because of some lack in the evidence.

Opn. at 9-10.

Petitioner criticizes the prosecutor's word choice by citing a passage from *Victor v. Nebraska*, 511 U.S. 1, 18 (1994): "'A reasonable doubt is an actual and substantial doubt arising from the evidence, from the facts or circumstances shown by the evidence, *or from the lack of evidence on the part of the state*, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.'" Pet. Rev. at 10; emphasis added by petitioner. Petitioner concludes that the prosecutor's word choice was "inconsistent with the federal Constitution. . . ." Pet. Rev. at 10.

The argument fails because petitioner takes the comment out of context, attributes to an ambiguous comment its most objectionable meaning, improperly assumes that a case about instructions applies to an assessment of a prosecutor's argument, and ignores the fact that the court correctly defined "reasonable doubt." Petitioner also ignores the presumption that a jury follows the court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Taken in context, the prosecutor's remarks meant that the jury could find

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

21

1  reasonable doubt only by assessing the "state of the evidence" (as stated in the reasonable doubt

2  instruction), rather than by mere conjecture.  The prosecutor's reference to the defense-friendly

3  "reasonable explanation" rule—yet another part of the record that petitioner ignores—made the

4  foregoing interpretation still more likely.  *See also* RT 1774 (distinguishing between speculation and

5  reasonable inferences; contending that prosecution is asking jury to make reasonable inferences, not

6  guesses or assumptions).

7       For all these reasons, the state court's opinion was not unreasonable.

8  **D.  The Prosecutor's Fourth Statement**

9       Remark No. 4:  Defendant claims that the prosecutor misstated the law in arguing
   against his self-defense theory by urging that it was irrelevant whether Vu reached for a

10  weapon before confronting defendant.  Defendant's analysis is again erroneous.

11       The entire context of the prosecutor's remarks are as follows:  "Now, Defense
    counsel then argues going frame by frame, watching Vu Pham moving his hands together,

12  undoing his leg, making an argument that he's reaching for a weapon, isn't it possible.
    That's what he said. Isn't it possible that Vu was just about to fight the defendant?  Again,

13  that's not the standard.  It's not whether or not it's possible, it's whether or not it's
    reasonable.  Is it reasonable what we know that Vu was about to get up and fight the

14  defendant?  Oh, and before he does that he[] goes to put on his coat and slowly back up
    a little bit. That's not appropriate. And secondly, it's not relevant. The only way that that

15  is relevant is if the defendant saw that, because remember, self-defense all deals with
    what's in the defendant's mind. It['s] not what's on the videotape.  The only way that the

16  defendant can use self-defense is if at that time he saw that. Not whether or not the victim
    was shifting his hands together.  It's whether or not the defendant saw that.  [¶]  Did he

17  testify to that? No.  Did he testify he saw Vu Pham putting his hands together? No.  Did
    he testify that he saw Vu going for his sock and looked like he was pulling out a knife?

18  No.  Did he testify that he saw Vu holding something that he thought was a knife?  No.
    See, what's so important for self-defense is what's in the defendant's mind.  And in this

19  case the defendant testified.   So whatever's on the videotape is irrelevant unless it
    corroborates what the defendant said he saw.  In this case he never said he saw any of that

20  when he testified."

21       In other words, the prosecutor urged the jury that the videotape did not support the
    self-defense theory because the videotape did not show (1) a reasonable possibility that

22  Vu reached for a weapon, or (2) anything seen by defendant that would cause him to fear
    real or apparent imminent danger.

23

24       There is no reasonable likelihood that the jury ignored the trial court's instructions
    and interpreted the prosecutor's argument to mean that it was irrelevant whether Vu

25  possessed a weapon.

26  Opn. at 10-11.

27       Petitioner says the prosecutor's argument was "legally incorrect, and tended to mislead the

28  jury as to the law" because Vu's actions were relevant, regardless of whether appellant saw them,

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

1  in that they tended to show that Vu was the aggressor. Pet. Rev. at 10-11. The argument fails first

2  of all because in the challenged paragraph the prosecutor was focusing on petitioner's state of mind,

3  and what petitioner did not see was indeed not relevant to his state of mind. It is not reasonable to

4  interpret the prosecutor's remark to mean that what Vu actually did was entirely irrelevant, given that

5  the prosecutor repeatedly pointed out elsewhere in his argument that what Vu did was indeed

6  relevant. *See* RT 1697-98 (defendant acted in self-defense if Vu presented an imminent danger of

7  death or great bodily injury and it was necessary to use deadly force); RT 1727 (Vu holding a

8  cigarette lighter did not make petitioner think he was about to be killed; Vu shown in video standing,

9  moving a little bit backward, and putting on his coat before he is stabbed); RT 1730 (Vu completely

10 unaware of what was about to happen to him; he didn't get out of that coffee shop fast enough; he

11 was not the aggressor); RT 1731 (by crossing his legs and putting a cigarette in his mouth, Vu

12 showed that he was relaxed and not about to get into a fight); RT 1732-33 (Vu was moving away

13 from petitioner and was alone; petitioner had no reason to fear him); RT 1783 (Vu was retreating,

14 not coming forward when he was stabbed); RT 1786-87 (Vu moving away from petitioner and

15 putting on his coat when he was stabbed). Only by ignoring all these references by the prosecutor

16 to Vu's actions can petitioner argue that the jury would have interpreted the prosecutor's challenged

17 remark to mean that Vu's actions were irrelevant to the question of whether Vu was the aggressor.

18          Even if the jury was likely to have interpreted the prosecutor's remark in the way petitioner

19 said it did, the jury was unlikely to have misapplied the law, given that (1) it was properly instructed

20 on self-defense and (2) any layperson would understand that what an alleged victim does before he

21 is attacked tends to show whether he provoked the attack.

22          For all these reasons, all of which petitioner ignores, the state appellate court's decision

23 was reasonable.

24 **E.    The Prosecutor's Fifth Statement**

25          Remark No. 5: Defendant finally claims that the prosecutor improperly argued that
   the jury should convict because it was the voice of the community that had to deal with

26 ongoing gang violence. Defendant points out that the jury's function is to decide cases on
   the law and evidence, not to speak out generally against gang violence. The prosecutor

27 remarked as follows.

28          "The other issue that sometimes comes up and it got brought up, and a lot of times

jurors who sit in a case like this, you know, you see societal issues, you say why do people become gang members, why do people join gangs, how do you get out of gangs, how do you get out of that life style? You know what, why the defendant became a gang member, you know, what society should do about it is a topic you could have at any point in time. But it has really no bearing on your verdict. Your verdict here today is to decide what the defendant did and what is his motivation for what he did. And I just need you to recognize that. [¶] You are here as the voice of this community to deal with this issue. This gang violence has been going on for 10 years between these two gangs. And gangsters have their own justice. We saw, we heard about Viet Mai. Seven months later he shot Truong Nguyen down the street. We know what happened when Nick Dang was killed by some Asian Warriors. You'll probably be reading a paper six, seven months from now and you're going to hear about some Asian Warrior that was killed in retaliation for Nick Dang. But in the criminal justice system as the voice of this community you have to stand up and say no more. This community is not going to accept this. You need to bring justice to this situation. You need to bring justice to Vu Pham's family for the violence and the tragedy that they've had to take because of the actions of that young man. You need to hold him accountable. Justice demands that you hold him accountable. And the law and the evidence in this case does as well. [¶] When you look at the evidence, ladies and gentlemen, you're going to find that the only reasonable interpretation of the evidence you've heard in this case is that the defendant and his gang members coordinated and attacked these Asian Warriors who had the audacity to be in their coffee shop."

It is generally inappropriate for a prosecutor to ask jurors to step outside their role as objective fact finders. [Citations.] As one federal court explained: "The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. [Fn. omitted.] Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem." (*United States v. Monaghan* [(D.C. Cir. 1984) 741 F.2d 1434] at p. 1441.)

Here, however, taken in context, the prosecutor's argument was not such an impermissible invitation for the jury to step outside its neutral role. The prosecutor reminded the jury that (1) societal issues had "no bearing" on the verdict, and (2) the verdict was "to decide what the defendant did." The prosecutor did not urge the jury to convict defendant to preserve order or deter future crimes, he simply appealed to the jurors as members of the community to hold defendant "accountable" for his behavior. Indeed, the same federal case that defendant cites to support his claim of error explains that prosecutors do not overstep constitutional bounds by exhorting jurors to "condemn" the accused for illegal behavior. (*United States v. Monaghan, supra,* 741 F.2d at p. 1442.) "Such appeals do not mislead the jury into considering social issues irrelevant to the defendant's own case. *Every* criminal conviction is a 'public condemnation' of the person convicted; it informs society, in a highly visible and meaningful fashion, that the defendant has engaged in socially proscribed activity." (*Ibid.*) [Italics in *Monaghan*.]

We reiterate that, "the question is whether there is a reasonable likelihood that the jury constructed or applied any of the complained-of remarks in an objectionable fashion." [Citation.] Here, the trial court instructed the jury on its task, stating they could not allow their decision to be influenced by "passion, prejudice, public opinion or public feeling." It also instructed that the jury was to decide the case based on the court's instructions, disregarding anything contrary about the law stated by the attorneys. Presuming, as we must, that the jury followed these instructions [citations], we conclude it is not reasonably likely that the jury misunderstood its proper role as a result of remark No. 5.

Opn. at 12-13.

1    Petitioner says the state court was wrong but simply repeats his argument that the "voice

2  of the community" comment was improper under a state case and "applicable federal cases, such as

3  . . . Monaghan. . . ." Pet. Rev. at 11.

4    Only by ignoring what the prosecutor said both immediately before and immediately after

5  the challenged remarks (and in the last sentence of the challenged paragraph as well) can petitioner

6  miss the plain meaning of the prosecutor's argument:  as the voice of the community, the jury was

7  required to decide from the evidence what the defendant did.  Taken in context, as they must be, the

8  prosecutor's comments did not misstate the law, much less render the trial fundamentally fair.  At

9  a bare minimum, the state court could reasonably have so concluded.

10    Any error was harmless, under *Brecht v. Abrahamson*, 507 U.S. 619, because the evidence

11  of murder was overwhelming, as explained in the previous argument.

12  <div align="center">**III.**</div>

13  **THE STATE APPELLATE COURT REASONABLY REJECTED THE
   CLAIM THAT DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE**

14  **ASSERTED INSTANCES OF PROSECUTORIAL MISCONDUCT
   DEPRIVED PETITIONER OF EFFECTIVE ASSISTANCE OF**

15  **COUNSEL.**

16    Petitioner argues that trial counsel performed ineffectively by failing to object to the "acts

17  of [prosecutorial] misconduct set forth above." Pet. Rev. at 12.  The state court rejected the claim

18  by noting that it had concluded that there was no misconduct. Opn. at 14.  Petitioner argues that the

19  appellate court was "mistaken" but supports the argument only with state authority suggesting that

20  an objection can lead to an admonition that would cure misconduct.  The cited authority does not

21  suggest that misconduct occurred or that High Court precedent required the state court to find that

22  it did.

23  <div align="center">**IV.**</div>

24  **THE STATE APPELLATE COURT DID NOT UNREASONABLY
   REJECT PETITIONER'S CLAIM THAT SUPPOSEDLY "IMPROPER**

25  **PINPOINT INSTRUCTIONS" VIOLATED DUE PROCESS.**

26    Petitioner objects because the trial court gave CALJIC Nos. 2.03, 2.06, and 2.52, which

27  petitioner believes were "improper pinpoint instructions." Pet. Rev. at 13.  The state appellate court

28  described the instructions as 'the pattern instructions for inferring a consciousness of guilt from the

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

<div align="center">25</div>

1   making of false or misleading statements, from the suppression of evidence, and from flight after the

2   crime." Opn. at 14. The court summarily rejected the claim:

3        Defendant contends that the instructions are improper pinpoint instructions that lessen the
         prosecution's burden of proof. He cites no authority that supports this argument and
4        acknowledges that we are bound by [California] Supreme Court precedent to the contrary.
         The most recent precedent succinctly concludes that the instructions are proper and do not
5        violate a defendant's constitutional rights. (*People v. Boyette* [2002] 29 Cal.4th [381] at
         p. 439.)

6

7   Opn. at 14.

8        Petitioner cites "the federal Constitutional principle that there must be absolute impartiality

9   as between the prosecution and the defendant in the matter of jury instructions. *People v. Moore*

10  (1954) 43 Cal.2d 517, 526-527 (1954); *Reagan v. United States* (1895) 157 U.S. 301, 310 . . . ; *see*

11  *Wardius v. Oregon* (1973) 412 U.S. 470 [state trial rules which provide nonreciprocal benefits to the

12  state when the lack of reciprocity interferes with the defendant's ability to secure a fair trial violate

13  the defendant's Fourteenth Amendment right to due process of law]. . . ." Pet. Rev. at 13-14.

14       Petitioner's authority is outdated. For an instruction to rise to the level of constitutional

15  error, the record must show a reasonable likelihood that the jury applied the instruction in a way that

16  violated federal law. *Estelle v. McGuire*, 502 U.S. 62, 72 and fn. 4 (1991). Petitioner has not shown

17  that the jury interpreted the instructions to lessen the prosecution's burden of proof, nor has he

18  shown why it would be unreasonable to conclude otherwise.

19       *Boyette* rejected the challenge to the instructions by repeating what the court had said in

20  *People v. Jackson*, 13 Cal.4th 1164, 1224 (1996):

21       [E]ach of [these] instructions made clear to the jury that certain types of deceptive or
         evasive behavior on a defendant's part could indicate consciousness of guilt, while also
22       clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and
         allowing the jury to determine the weight and significance assigned to such behavior. The
23       cautionary nature of the instructions benefits the defense, admonishing the jury to
         circumspection regarding evidence that might otherwise be considered decisively
24       inculpatory. [Citations.]  We therefore conclude that these consciousness-of-guilt
         instructions did not improperly endorse the prosecution's theory or lessen its burden of
25       proof and thus were not improper pinpoint instructions.

26  *People v. Boyette*, 29 Cal.4th at 439. Petitioner does not explain why *Boyette* is unreasonable. None

27  of petitioner's cited authority addresses instructions of this kind or explains why it is unreasonable

28  to believe that they do not lessen the prosecution's burden of proof.

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

26

<div align="center">

**V.**

</div>

2    **THE STATE APPELLATE COURT DID NOT UNREASONABLY**
     **REJECT PETITIONER'S CLAIM OF CUMULATIVE ERROR.**

4          The state appellate court rejected petitioner's claim of cumulative error by noting that it

5    had rejected the claims individually. Opn. at 17. Citing no authority, petitioner in effect reasserts

6    the claims.

7          According to *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007), "Supreme Court

8    precedent clearly established that the combined effect of multiple trial court errors violates due

9    process where it renders the resulting criminal trial fundamentally unfair. *See Chambers* [*v.*

10   *Mississippi*,] 410 U.S. [284] at 298, 302-03 [(1973)] . . . (combined effect of individual errors

11   ""denied [Chambers] a trial in accord with traditional and fundamental standards of due process""

12   and ""deprived Chambers of a fair trial"").

13         Petitioner has not shown (a) individual error, (b) a combined effect from multiple error that

14   resulted in a fundamentally unfair, or (c) an unreasonable conclusion by the state court to the

15   contrary.

<div align="center">

**VI.**

</div>

17   **THE STATE SUPREME COURT REASONABLY REJECTED**
     **PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF**
18   **COUNSEL ON APPEAL.**

19         Petitioner reprises his claims to the California Supreme Court that he was deprived of

20   effective assistance of counsel on appeal because appellate counsel failed to claim on direct appeal

21   to the intermediate state appellate court that trial counsel's failure to object to the various asserted

22   instances of prosecutorial misconduct constituted ineffective assistance of counsel. State Hab. Pet.

23   at 19, 28, 46. The claim fails for the same reason the claims fail on the merits—the state appellate

24   court reasonably found no misconduct.

25         Petitioner contends that counsel on direct appeal performed ineffectively in failing to raise

26   two other claims: that the trial court erred by admitting evidence of Bao Tran's plea agreement

27   (State Hab. Pet. at 31) and that the trial court erred by "failing to allow petitioner's jury to consider

28   a verdict of involuntary manslaughter." State Hab. Pet. at 34. The first claim rests on the same

1  flawed premise as the claim of prosecutorial misconduct for so-called "vouching." That is, it

2  assumes that "vouching" occurred. As explained previously, it did not. The second claim rests on

3  an assertion that substantial evidence supported the conclusion that petitioner acted only with

4  criminal negligence in killing the victim. State Hab. Pet. at 37-46. However, he fails to show how

5  the evidence supported such a conclusion. He says simply that "the fact pattern in petitioner's case

6  is similar to those in" several cases of involuntary manslaughter. State Hab. Pet. at 46. This

7  conclusory argument does not begin to show that reasonable appellate counsel would have brought

8  the claim or that it would have succeeded. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Still

9  less has he shown that the California Supreme Court acted unreasonably in rejecting the claim of

10  ineffective assistance. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) (federal habeas

11  review of state court's ruling on Strickland claim is "doubly deferential").

12                                    **CONCLUSION**

13          For the reasons stated, respondent requests that the petition be denied and the order to

14  show cause discharged.

15          Dated:  January 25, 2008

16                                    Respectfully submitted,

17                                    EDMUND G. BROWN JR.
                                      Attorney General of the State of California

18                                    DANE R. GILLETTE
19                                    Chief Assistant Attorney General

                                      GERALD A. ENGLER
20                                    Senior Assistant Attorney General

                                      PEGGY S. RUFFRA
21                                    Supervising Deputy Attorney General

22

23                                    /s/ Jeremy Friedlander

24                                    JEREMY FRIEDLANDER
                                      Deputy Attorney General

25                                    Attorneys for Respondent

26  JF:er
    40206563.wpd
27  SF2007402579

28

Memo Of P&As In Support Of Answer - *Nguyen v. Evans* - C 07-3979 SI (PR)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    *Nguyen v. Evans*

No.:    **C 07-3979 SI (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On January 25, 2008, I served the attached **1. ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; 2. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER; and 3. NOTICE OF LODGING OF EXHIBITS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

An Duy Nguyen
V-68985
Salinas Valley State Prison
P.O. Box 1050
Soledad, CA 93960-1060
(w/out exhibits)

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on January 25, 2008, at San Francisco, California.

| | |
|---|---|
| E. Rios | *E. Rios* |
| Declarant | Signature |

40206663.wpd